

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00076-CV

IN THE INTEREST OF D.A.,
A CHILD

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-97474J-12

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an ultra-accelerated appeal[2] in which Appellant Father appeals the

termination of his parental rights to his son, D.A. In three issues, Father argues

that the evidence is legally and factually insufficient to support the endangering-

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

environment, endangering-conduct, and best-interest findings under Texas Family Code section 161.001(1)(D) and (E) and section 161.001(2). *See* Tex. Fam. Code Ann. §§ 161.001(1)(D), (E), (2) (West 2014). We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Overview

Father is the presumed father of D.A. D.A. appeared at school on November 1, 2012, with noticeable bruises on his face, and it was discovered later that day that he had bruises covering eighty percent of his back. Father admitted inflicting the bruises on D.A.'s face and back with a belt during a five-minute "spanking" session the previous night. Father testified that this was a one-time occurrence.

The jury heard testimony from eighteen witnesses, including Father and Mother.[3] Because the 1,800-page record contains conflicting testimony on previous abuse of D.A. by Father and domestic violence in the home and because Father challenges the best-interest finding, we set forth a detailed summary of the record below.

---

[3]The jury found by clear and convincing evidence that Mother had committed the endangering-environment and endangering-conduct grounds found in Texas Family Code section 161.001(1)(D) and (E) but that termination of the parent-child relationship between Mother and D.A. would not be in D.A.'s best interest. Based on the jury's findings, the trial court did not terminate the parent-child relationship between Mother and D.A. The trial court did, however, appoint the Texas Department of Family and Protective Services (TDFPS or the Department) as managing conservator of D.A. Because only Father is involved in this appeal, we set forth facts related to Mother only when they are necessary to the disposition of Father's appeal.

## B. Teacher and School Nurse See Marks on D.A.

D.A.'s third-grade teacher sent him to the school clinic on November 1, 2012, because she saw a mark on his face near one of the flaps on D.A.'s hat.[4] When D.A. arrived in the school clinic, the school's nurse, Evelyn Dubois, could see part of a mark, but most of the mark was covered by the hat. After convincing D.A. to remove the hat, Dubois was concerned about the mark on D.A.'s face. D.A. put the hat back on, and Dubois took D.A. to the counselor's office.

Once in the counselor's office, it took more coaxing for D.A. to remove the hat a second time. Dubois and the school counselor asked D.A. how he had received the mark. D.A. said that he had been hit with a belt because he did not listen to Father. Later, when D.A. removed his shirt, Dubois saw that D.A. also had a mark on his shoulder and "more marks against the thoracic part down his side . . . and back."

Dubois testified that she had concerns for D.A.'s safety because his injuries, which she described as deep contusions, revealed that he had not been spanked but rather that he had been beaten. Dubois testified that she had never seen a child at that school with injuries as severe as D.A.'s. Dubois contacted the police and CPS because she did not believe it was safe for D.A. to return to his home after school.

---

[4]D.A. was wearing a monkey stocking cap for the school's hat day.

### C. Police Interview D.A. and Order Him Transported to Cook Children's Hospital

Officer Anthony Tseung with the Arlington Police Department testified that he responded to the call from the elementary school saying that a father had abused a child. When D.A. removed his cap, Officer Tseung saw that D.A. had an injury to his face that looked like the imprint of a belt buckle. Officer Tseung asked D.A. how he had been injured, and D.A. said that he had gotten in trouble with Father for answering Father's questions too slowly; D.A. said that Father had "whooped" him with a belt. D.A. did not remember how many times Father hit him with the belt; he could remember only that it was more than one time.

Officer Tseung requested that D.A. remove his shirt and approximated that eighty percent of D.A.'s back was covered with injuries. Officer Tseung described D.A.'s injuries as severe. The Arlington Police Department decided that they wanted D.A. to be transported to Cook Children's Hospital to be checked for internal injuries.

Officer Tseung went to Cook Children's Hospital with D.A. and stayed there until his shift ended at 9:00 or 9:30 p.m. Officer Tseung did not speak directly to Father but heard CPS interview Father. During that interview, Father said that D.A.'s injuries were from Father's disciplining D.A. Officer Tseung said that he interpreted Father's response as admitting that he had caused the injuries to D.A.

Officer Tseung testified that the injuries were not the result of a spanking but of a beating. Officer Tseung said that D.A.'s case was one of the most severe cases of child abuse that Officer Tseung had seen.

Detective Victor Hadash, also with the Arlington Police Department, testified that he was on the scene on November 1, 2012, and interviewed D.A.'s teacher, the counselor at the elementary school, and the CPS investigator. Detective Hadash concluded through his investigation that D.A. had been beaten. Detective Hadash prepared an arrest warrant for Father for the offense of injury to a child, which is a third-degree felony with a punishment range of two to ten years in prison.[5]

### D. D.A.'s Medical Examination at Cook Children's Hospital

Dr. Sophia Grant, who works on the CARE Team that sees children with concerns of abuse and neglect at Cook Children's,[6] testified that when D.A. presented to the hospital on November 1, 2012, he had multiple significant injuries and that it appeared that he "was the victim of a beating, which caused extensive bruising" and was painful to D.A. Dr. Grant explained that D.A. had a bruise on his left cheek that extended above the left eye and affected the ear, as well. Dr. Grant testified that whenever a belt comes into contact with an eye,

---

[5]According to Detective Hadash, Father's injury-to-a-child case was still pending at the time of the termination trial.

[6]Dr. Grant stated that she had reviewed the records from Cook Children's pertaining to D.A. and that she was testifying because the doctor who had treated D.A. was out of the country at the time of the termination trial.

there is concern for damage to the eye and even blindness and that a strike to the side of the head can cause the ear drum to rupture and can cause deafness.

Dr. Grant testified that the hospital records reflected that D.A. also had purple-red bruising on his mid and upper back that extended to the right rib cage and chest and that D.A. had two smaller discolored bruises to the right and left lower back that appeared to be in a different stage of healing than the other bruises on his back. Dr. Grant stated that the different stages of the bruising on D.A.'s lower back indicated prior episodes of abuse. Dr. Grant opined that it would be highly unusual for D.A.'s older bruises to have been caused by playing on the playground because they were located on the fleshy part of his back. Dr. Grant testified that children tend to bruise on the frontal surfaces of the body when they fall forward.

Dr. Grant testified that the hospital records indicated that D.A.'s injuries were caused by Father's hitting D.A. with a belt the night before he went to the hospital because D.A. did not answer a question quickly enough. The hospital records also indicated that D.A. had said that this had happened before.

The hospital records revealed that Mother and Father reported to CPS and to the Arlington police officers that D.A. had a condition that caused him to bruise easily. Dr. Grant testified that even if D.A. had such a condition, it would not negate the fact that he was bruised by being hit with a belt. Dr. Grant testified that the hospital ran blood work to determine if what the parents had said was true, and the lab work came back normal. Dr. Grant testified that if D.A. really did

6

have a condition that caused him to bruise easily, he would have had bruises on areas that are commonly bruised in childhood play, such as his elbows, chin, knees, or shins; D.A. did not have bruises on those areas. Dr. Grant testified that she was satisfied that sufficient tests had been performed to negate a bruising condition as a possible explanation for D.A.'s injuries.

Dr. Grant testified that D.A.'s bruises and abrasions indicate a high level of violence.[7] Dr. Grant testified that there was extensive bruising on D.A.; that the bruising on D.A. was a serious injury constituting abuse; and that the bruising was the result of a beating, not a spanking. Dr. Grant testified that there was nothing in the medical records to corroborate any claim that D.A.'s injuries were caused by anything other than child abuse.

### E. CPS's Investigation and Removal of D.A.

Gerri Tarver Madden, a former investigator for CPS, testified that she had responded at 2:30 p.m. on November 1, 2012, to the referral from the elementary school regarding allegations of physical abuse. When Madden first saw D.A., she noted that he had bruising on his face.[8] Madden met with D.A. alone and

---

[7]Dr. Grant testified that "when you take an object and you strike another human being with that object and it causes bruising, that in and of itself is a high level of violence." She explained that her opinion was based on her credentials as a child-abuse physician, her expertise in abusive injuries, and her familiarity with the law on child abuse.

[8]The record includes a service plan giving an update as of December 6, 2012. The notes under that date appear to give background information relating to the removal, but the timing of the following findings is not provided: D.A. appeared very thin and said he was only allowed to eat Ramen noodles in the

7

noted that he was developmentally on target, was very articulate, was very intelligent, and was able to understand and answer her questions.[9]  D.A. was able to differentiate between the truth and a lie, and he promised to tell the truth.

Madden asked D.A. what happened when he got in trouble at home, and D.A. told Madden that on October 31, 2012, Father had hit him with a belt in the face, which had caused bruises, and that Father had spanked D.A. on his back with a belt, which had caused the bruises on his back.  D.A. said that on the night in question, Father came into the living from Father's bedroom and asked D.A. if he had eaten any pizza.  D.A. told him that he had.  Father asked D.A., "Why are you looking at me that way?"  D.A. told Madden that he took too long to respond to Father's question, and Father told D.A. to go to Father's bedroom.  D.A. said that Father retrieved a belt and spanked D.A., who was wearing a Wolverine costume for Halloween.  D.A. said that Mother was in the master bathroom, which was located off of Father's bedroom, when D.A. was spanked.  After the "spanking," Father made D.A. stand in the corner "for what seemed like a long time."  Later, the family played inside because it was too late to go trick-or-treating.  D.A. said that his face and his back had hurt that night.  When asked if

---

home; he was dirty, his clothes were dirty, and he had not had a bath; his finger nails and toe nails were very long; and he was wearing dirty underwear and socks.

[9]Madden recorded her interview with D.A. at the elementary school, but she testified at trial that the DVD could not be found.

8

he was afraid of anyone, D.A. said that he is afraid of Father when he gets spanked.

Madden asked D.A. if he had left the home at any time on Halloween night, and D.A. said that he had not; he said that he was not allowed to go outside at any time without his parents or without their permission. D.A. said that Father knew that he had not left the house and that Father knew that D.A. was in the living room waiting to go trick-or-treating.

D.A. said that on November 1, Mother overslept, so he got himself ready for school and waited for her to wake up. When Mother woke up, she told D.A. that he did not have to go to school that day. D.A. said that he wanted to go to school because it was crazy hat day, and he wanted to wear his hat to school. D.A. said that Mother told him that if anyone asked about his bruises, he should say that he had fallen. D.A. said that he did not eat breakfast and that he was too late to get breakfast at school. D.A. said that he did not see Father that morning.

D.A. told Madden that when his parents argue, sometimes Father hits Mother. D.A. had seen Father hit Mother, and he had heard Father hit Mother when D.A. was in his bedroom.

When Mother came to the school, she talked to Madden in the presence of an Arlington police officer. Madden asked Mother whether she knew if D.A. had been spanked, and Mother said that she knew that Father had spanked D.A. the previous night but that she did not know why D.A. had been spanked. Mother

said that she was in the master bathroom when D.A. was spanked and that she was very distraught because she had recently lost her great-grandmother. Mother admitted that she had told D.A. to tell people that he had fallen. Madden told Mother that she and Father needed to meet Madden at the hospital to determine a safe plan for D.A., and Mother said that she was going home first to change clothes and then would meet Madden at the hospital.

Madden followed the ambulance to the hospital around 3:45 p.m. At 5:15 p.m., Father called Madden and said that he had to close up shop and take care of business; Madden explained that it was an emergency and that Mother and Father needed to come to the hospital as soon as possible. At 7:15 p.m., Father called and said that he was in the hospital's parking lot, trying to find a parking spot.

When Father came inside the hospital,[10] Madden interviewed him with a police officer present. Father said that he and Mother had lived in Nevada and had moved back to Texas approximately a year and a half to two years before November 1, 2012. Father admitted that he had a criminal history in Nevada. Father said that while he and Mother lived in Nevada, Paternal Grandmother took care of D.A. Father said that he did not want D.A. influenced by Paternal Grandmother because when she had cared for D.A. while Father and Mother lived in Nevada, Paternal Grandmother had taken D.A. "behind their backs" to be

---

[10]Mother did not come to the hospital.

10

diagnosed as autistic. Father said that he did not believe that D.A. was autistic and did not want him labeled as autistic. Father said that he and Mother had worked hard with D.A. to be normal and to teach him how to act.

Father said that D.A. is a very good child; Father had spanked D.A. with a belt[11] probably five times in his lifetime. Father admitted that he had spanked D.A. for five minutes with a belt on Halloween and that he had left bruises on D.A.'s back and face. Father said that the bruise on D.A.'s face was an accident that had occurred when D.A. had "raised up" during the "spanking."

Father said that on Halloween night, he was in his bedroom getting ready to take D.A. trick-or-treating. Father said that D.A. was in the living room wearing his Wolverine costume. Father said that when he came out of his bedroom, D.A. had left the house. Father went outside to look for D.A., and when Father returned, he found D.A. in the living room watching a movie.[12] Father told D.A. to go to Father's bedroom and lie face down on the bed. Father retrieved his belt and spanked D.A. Father said that the next morning, Mother overslept, and he ate breakfast with D.A., who seemed to be fine.

Madden concluded that D.A. could not go home with Father and testified that there was no option other than foster care at that point.

---

[11]Father said that he had been told not to spank a child with his hand.

[12]Father indicated to Madden that it was possible that D.A. had not left the house and that Father may have disciplined D.A. for no reason.

11

Madden interviewed Mother on November 7, 2012, at the parent-child visit. Father did not want Mother to speak to CPS alone; he wanted to be present for her interview. Madden asked Mother about being the victim of domestic violence, and Mother denied that there had been any physical abuse.

Mother said that Father had spanked D.A. in the past. Mother said that on the evening of October 31, she had planned to stay home; Father was going to take D.A. trick-or-treating, but D.A. was excited and ran off. Mother said that it was dark and dangerous outside, so Father went to find D.A.; Mother did not go look for D.A. Mother said that when Father returned home, D.A. was in the living room watching a movie. Father questioned D.A., and D.A. did not answer Father's questions. Mother said that Father told D.A. to go lie on Father's bed and spanked him with a belt. Mother said that she was in the master bathroom distraught because she had recently lost her great-grandmother. Mother said that she had heard Father spanking D.A.; that Father had stopped and had asked D.A. questions; and that when D.A. had lied, Father had continued to spank D.A. When Mother came out of the bathroom, she heard Father tell D.A. that he was not allowed to lie to his parents because they were there to protect him. Mother felt that the bruise to D.A.'s face was an accident.

Mother said that her alarm did not go off on November 1 and that her plan was to keep D.A. home from school because they were late. Mother admitted that she had told D.A. to lie and say that he had fallen down if anyone asked about the bruises on his face. Mother said that D.A. did not eat breakfast that

morning and that she did not remember Father seeing or talking to D.A. before Mother took D.A. to school.

Madden testified that D.A.'s injuries could be traumatizing to him. She said that it was concerning that Father had said that he had spanked D.A. for five minutes because that "is a long time to be spanked." Madden testified that D.A.'s injuries indicate that "this is more than a spanking and that it is a beating." Madden disposed of the case as reason to believe for physical abuse.

### F. D.A.'s Forensic Interview

Joy Hallum, a child forensic interviewer and investigator for TDFPS, testified that she had conducted a forensic interview of D.A. on November 16, 2012, at the Alliance for Children in Arlington. During the interview, Hallum questioned D.A. about his injuries and his home life. A video of the interview was played for the jury.

During the video, D.A. provided his birthdate and stated that he was nine years old. He explained that when he was watching a movie in the living room of the house on Halloween, Father came out of his room; Father was about to get a piece of a pizza, and he asked if D.A. was hungry. D.A. said no and explained that he had already eaten a piece of pizza. Father asked D.A. another question, and D.A. said that he did not know what Father was asking and that he took too long to answer the question. D.A. said that Father had an angry face when D.A. did not answer fast enough. D.A. said that Father went into his room and got his belt from his closet. D.A. explained that he was by Father's bed when Father

13

retrieved the belt, that Father told D.A. to lie down on Father's bed, and that D.A. had his Wolverine costume on. D.A. said that Father held the belt by the buckle. Father did not say anything when he gave the spanking but hit D.A.'s back and then his face. D.A. said that it hurt when he got the spanking. D.A. told Hallum that Mother was in Father's bathroom and did not know he was getting a spanking. D.A. said that afterwards, Father made him stand in the corner. D.A. said that sometimes in the past, he had been hit with a clothes hanger, that he did not know who had hit him, and that it had hurt when he was hit with a hanger.

Hallum testified that D.A. had answered many of her broad questions with "I don't know" but that he had provided more details in a narrative form when Hallum had asked direct questions. Hallum said that such responses indicated that sometimes he was not ready to talk about a particular issue. During the interview, D.A. got out of his chair to describe how he was positioned on the bed during the spanking, which gave Hallum a lot of information and confirmed what he was telling her. Hallum did not see anything during the interview that indicated that D.A. was not telling the truth.

### G. CPS's Removal of D.A. from Foster Care and Placement with Paternal Grandmother

After CPS removed D.A. from his parents on November 1, 2012, D.A. spent almost two months in a foster home before being moved to Paternal Grandmother's home.

14

## H. Paternal Grandmother's Testimony

Paternal Grandmother testified that D.A. likes to swim and to read, that he loves sharks and wild mustangs, that he is very outgoing but has a problem with social skills, and that he is brilliant. Paternal Grandmother testified that D.A. reads on a tenth-grade level.

Paternal Grandmother testified that D.A. had gone back and forth between her house and his parents' house for five and a half years, that she was the primary babysitter, and that D.A. had lived with her for long periods of time. Paternal Grandmother kept D.A. all during kindergarten, and his parents came to pick him up in July. D.A. lived with Paternal Grandmother for two years while Mother and Father lived in Las Vegas; they did not visit him during that time but did talk to him on the phone.

Paternal Grandmother testified that Mother and Father were not around when D.A. was diagnosed with autism and that she wanted them to have visitation first before D.A. went to live with them when they came for him in July so that they could understand him. Paternal Grandmother said that she believed that Father and Mother did not take the diagnosis seriously in the beginning.

Paternal Grandmother testified that she had concerns prior to D.A.'s removal on November 1, 2012. She saw D.A. in July 2012 and noticed that he had a bruise by his ear and that he was "really skinny."[13] Paternal Grandmother

---

[13]Paternal Grandmother believed that D.A. lost weight during the times he lived with Mother and Father.

15

was not on speaking terms with Father at that time and had fears because she was being shut out of D.A.'s life by Mother and Father. Later, when D.A. was living with her, Paternal Grandmother noted that when she was hanging up clothes, D.A. "wigged out" and acted scared when he saw clothes hangers.

After Paternal Grandmother saw the pictures of D.A.'s injuries at the beginning of the case, she said that she was scared that Mother and Father would kill D.A. From the first day that D.A. came to live with Paternal Grandmother in December 2012, she alerted the Wise County Sheriff's Department and the school that they needed to be on high alert because she was scared that Mother and Father were going to come and try to do something. Paternal Grandmother alerted the school, the sheriff's department, and the school bus drivers again when she learned that the Department was moving forward with terminating Mother's and Father's parental rights.

Paternal Grandmother testified that she did not know that it was a violation of the trial court's orders to allow D.A. to talk to Father in September 2013 on D.A.'s birthday. Paternal Grandmother admitted that she had also allowed D.A. to have contact with his parents on October 26, 2013; Paternal Grandmother said that on that date, D.A. needed a cheering squad at his soccer game for his self-esteem, and so she believed that she was doing what was best for D.A. by inviting Maternal Grandmother, Mother, and Father. After D.A.'s soccer game,

16

they all went to the fall festival.[14]  Paternal Grandmother testified that after the interaction with his parents at the fall festival, D.A. did not have any anxiety.

Paternal Grandmother testified that she did not know that unsupervised interactions between D.A. and his parents would cause D.A. to be removed from her care.  Paternal Grandmother admitted that she had lied to CPS by signing the document saying that she would allow D.A. and his parents to visit only as approved by TDFPS and the trial court and that she would cooperate in making approved visits possible.

## I.  D.A.'s Psychological Evaluation and Sessions with Psychologist

Dr. Brandon Bates, a psychologist, testified that D.A.'s Paternal Grandmother had approached him in 2013 to provide professional services to D.A. while D.A. was living with her.  Dr. Bates conducted a psychological evaluation of D.A. and saw him twenty-six times between January 21, 2013 and November 6, 2013.

Dr. Bates testified that D.A. had demonstrated some awkwardness in how he interacted with others and said that D.A. is an intelligent child but has difficulty maintaining conversation and initiating conversation with others.  Dr. Bates testified that he could engage D.A. in superficial dialogue, but D.A. had a tendency to "lock up and not communicate" when the conversation was uncomfortable.  Dr. Bates diagnosed D.A. with Asperger's Disorder and attention

---

[14]Mother, Father, and D.A. had their picture taken in D.A.'s room at Paternal Grandmother's apartment after the fall festival.

17

deficit hyperactivity disorder (ADHD). Dr. Bates explained that the dual diagnosis is significant in D.A.'s case because a big part of what he struggles with is communicating, especially if he is uncomfortable, and the difficulty in communicating is magnified by his difficulty in staying on task.

Dr. Bates testified that children with Asperger's are typically "pretty literal and pretty black and white. And so their fears are usually pretty founded." Dr. Bates testified that D.A. had a lot of anxiety regarding the visits with Mother and Father, so one of the primary goals of the sessions was to teach him some skills to deal with that anxiety. D.A. told Dr. Bates that he was anxious about the visits because he was scared that Father was going to get mad at him. Specifically, D.A. was afraid that Father would hit him if he took too long to answer a question from Father because in the past, Father had gotten really mad at D.A. when he was not able to verbalize responses;[15] D.A. had a tendency to sit there and look at a person when he could not verbalize a response. Dr. Bates worked with D.A. on different ways that he could feel safe, such as controlling his breathing and his thoughts when he started to get overanxious.

Dr. Bates noted that the fears that D.A. had expressed on March 4, 2013, regarding Father's hitting him, did not go away by D.A.'s May 6, 2013 office visit with Dr. Bates and continued to be a very regular theme, as shown by the

---

[15]Dr. Bates could not determine whether D.A. was spanked on every occasion when he took too long to answer a question from Father; Dr. Bates said that D.A. could have been spanked only on October 31, 2012.

therapy notes. In October 2013, D.A. made progress related to his anxieties and his fears about contact with his parents. But at the last session on November 6, 2013, Dr. Bates learned that D.A. had recently seen his parents in an unsupervised setting and that his behavior had deteriorated; D.A. began having a lot of problems at school and had been in trouble twice at school that week.

Dr. Bates agreed that the injuries D.A. had received constitute child abuse because they were well beyond corporal punishment. Dr. Bates said that if D.A. was asked to testify regarding the abuse he had suffered, "it would really set him back[,]" and "he would probably completely free[ze] up and . . . regress."

Dr. Bates testified that D.A. needs a home in which his care providers are willing to learn about Asperger's, how to work with a child who has been physically abused, and different disciplining methods. Dr. Bates stated that discipline for D.A. will have to be "a little bit out of the norm, thinking outside the box" because corporal punishment is not going to be effective and would probably "go the opposite way." Dr. Bates said that D.A. needs a home in which his care providers understand that when D.A. does not respond to a question, he is locked up and possibly nervous, but he is not being defiant. Dr. Bates summarized that D.A. needs a home with a lot of understanding and that is calm, that provides structure, and that lets D.A. know what is to be expected and what is going to happen. Dr. Bates testified that he would have a lot of fear about a household that rejects the idea that D.A. has Asperger's and that he would be

19

concerned about a home in which the care providers think that there is nothing wrong with the discipline that D.A. received that caused his injuries.

When asked at trial whether D.A. could go home to Mother and Father, Dr. Bates, who had not seen D.A. in two and a half months, testified that it would depend on how D.A. was currently doing and his current level of fear. Dr. Bates testified that it would give him concern if Mother and Father did not complete everything on their service plans.

## J. CPS's Removal of D.A. from Paternal Grandmother's Home and Placement in Ms. Foster's[16] Home

Following the unsupervised access that Paternal Grandmother allowed Mother and Father to have with D.A. on October 26, 2013, at D.A.'s soccer game and at the fall festival, CPS removed D.A. from Paternal Grandmother's home and placed him with Ms. Foster.

## K. Foster Mother's Testimony

Ms. Foster testified that D.A. had been in her home since November 7, 2013.[17] Ms. Foster described D.A. as a very outgoing, highly intellectual boy whose favorite subject is sharks. She said that he makes excellent grades and can sit in the general classroom with other students without any challenges. Ms. Foster testified that D.A. is a true leader and assists other children in her home

---

[16]During the trial, the pseudonym "Ms. Foster" was given to D.A.'s current foster mother.

[17]The termination trial started on January 28, 2014.

20

who have intellectual disabilities by reading to them and by helping them with their homework. D.A. is not prone to accidents, has good eye-hand coordination that he uses at bowling each week, and has never injured himself in Ms. Foster's presence or at school.

Ms. Foster's autistic grandson lives with her, so she was familiar with how to handle situations that come up with autism. Ms. Foster testified that she uses the "thinking corner" to discipline D.A. or has a conference with him. She said that sometimes it takes D.A. until the next day to respond to her questions but that he is "very, very respectful" and will address her questions. Ms. Foster stated that D.A. is a young man of high integrity and always tells the truth.

Ms. Foster said that D.A. talks about his visits and mostly Mother and Paternal Grandmother. Ms. Foster testified that D.A. loves Mother and Father "very, very much" and talks about how Father taught him chess. Ms. Foster said that after a recent visit, D.A. said that he did not communicate with his parents during the visit; he played chess with Father on the computer and watched movies. Ms. Foster stated that on numerous occasions, D.A. had said that he loves Father but is afraid of him. D.A. said that Father had hurt him and that he likes being in Ms. Foster's home because she will not hit him.

### L. CASA Volunteer's Testimony

Len Baird, D.A.'s CASA volunteer, testified that he had been with D.A. since a week after his removal from his parents. Baird said that D.A. was "very, very thin" the first time he met him and that he was quiet but pleasant. Baird said

that D.A. had put on weight, had been able to verbalize more, did well in school, and was polite. Baird testified that D.A. had gotten stronger and was able to jump on a trampoline and had learned to ride a bike.

Baird had attended all of the hearings and had tried to observe most of the visits. Baird testified that at the first visit that he attended, Father was arrested on pending criminal charges involving the injuries to D.A. Baird testified that Mother and Father had missed one visit because their car was broken and that Father had missed one visit because he was on a business trip. Baird testified that during the visits, D.A. did not talk much. Sometimes Mother, Father, and D.A. took turns reading or playing a video game, but "a lot of the times," Father showed YouTube videos to D.A. Baird did not witness Father ask D.A. how he was doing.

Baird testified that sometimes at the visits, the interactions between Father and D.A. were not appropriate. Baird recalled a visit during which D.A. was excited to play a bowling game because he felt like he was on a winning streak. D.A. had some teeth pulled earlier that day, and Father said, "You have about as good a chance of winning as you do growing those baby teeth back." Father also went over and threw some black pompoms into the trash; D.A. got quiet, and his eyes filled with tears. Neither parent comforted D.A. when his eyes filled up with tears. During another visit when D.A. was wearing a 4-H cap because Paternal Grandmother had gotten him involved in 4-H, Father kept mocking D.A. by repeating in a sarcastic country accent a word that D.A. had used when he had

explained 4-H to his parents. The visits were never terminated, but the CPS facilitator redirected the conversation at two or three visits during which Father had talked about genetics and computer programming with D.A.

Father told Baird on March 28, 2013, that he had spanked D.A. only four times in his life and that there would be no more spankings.

When Baird called Father on July 31, 2013, to obtain the parents' new address, Father told Baird that everyone was against them and was trying to make them out to be bad parents, that the photos of D.A.'s injuries had been doctored, that D.A. did not tell the truth, and that D.A. still had not told the truth. Father also asked Baird why he had told the court at a previous hearing that all the visits had not been positive. Father said that he had never spanked D.A. before and that the spanking on October 31 was an exception because there was a different story than what was in the file. Father questioned why D.A. had been moved to Paternal Grandmother's house when Mother and Father had always been good parents. Father further stated that the night he had spanked D.A., "it might have been excessive," but he was never told any rules about spanking. As of July 31, 2013, Father was still referring to the incident as a spanking. Father's statements concerned Baird because Father was not taking responsibility for the injuries that he had inflicted on D.A.

Baird said that D.A. was shy when he first met him but that after he was removed from Paternal Grandmother, he had gained confidence and was very

23

outgoing. Baird testified that D.A.'s interactions with Ms. Foster were calm and positive and that she had a very organized, quiet, structured home.

## M. CPS Caseworker's Testimony Regarding Father's Visits and Compliance with Service Plan

Gale Davis, D.A.'s CPS caseworker, testified that she had observed eight to ten visits between D.A. and his parents; none of the visits were terminated, but she did have to redirect Father because he was too loud. Davis said that Father usually brought electronics like his phone, an iPad, or a Kindle to the visits and that Father was redirected when he used his phone or his Kindle to show videos at the visits. Davis testified that they had to keep changing the time for the visits because of the parents' excessive tardiness. Davis did not believe that D.A.'s anxiety regarding the visits was the result of being transported to the visits in Lake Worth but instead believed that his anxiety was the result of visiting with Father. During the times when Davis transported D.A. to visits, he did not express that he loved Father and Mother.

Davis testified that Father's service plan required him to participate in individual counseling, to attend parenting classes, to submit to drug testing,[18] to refrain from criminal activity, and to show proof of financial stability and suitable housing. Davis went over the service plan with Father on December 10, 2012, and Father was clear on what the Department's expectations were. Father,

---

[18]The Department later determined that it was not necessary to request drug testing.

despite receiving his service plan in December, did not start working it until late February 2013.

Before he started individual counseling, Father expressed that he did not feel like he needed to have any individual counseling. Father went through individual counseling but was discharged unsuccessfully.

Father was given two options for parenting classes, but he did not complete either of the two options approved by CPS. After voir dire for the termination trial concluded, Father gave Davis a certificate from the AJ Nova Group, attempting to show that he and Mother had completed a four-hour parenting class, but Davis was unfamiliar with the curriculum provided by this unapproved group and said that the approved curriculum was eight or twelve hours. Father therefore did not successfully complete parenting classes.

Davis testified that she was not aware of Father's engaging in any criminal activity while the termination case was pending.

Father did not provide proper proof of his income; after voir dire concluded, Father attempted to provide proof of his income based on some handwritten papers that say "Prestigious Worldwide" on them. Davis testified that Father and Mother have housing, but Davis had not received a complete copy of their lease; the one page that she was given did not have Mother's name on it and did not say whether they could have a child live with them.

25

Father was asked to attend a batterer's intervention class, and Mother was asked to go to a victim's class because of domestic violence in the home; Father and Mother completed those services.

In April 2013, CPS's plan changed from reunification to a concurrent plan of termination because Davis had not received proof that the service plans had been completed.

Davis testified that the Department's concern was that D.A. had been beaten excessively. Davis testified that in determining whether a child should be returned to his parents, she looked for the parents (1) to acknowledge the situation that brought the child into care; (2) to engage in services; and (3) to demonstrate that there has been a change of attitude, heart, or mindset that would cause them to be protective. Father had not acknowledged that it was wrong to beat D.A.; Father told Davis that he did not do anything wrong and that it was his right to discipline his child. Father had not completed his service plan, and to Davis's knowledge, Father had not demonstrated that he had made the necessary changes to prevent D.A. from being harmed like he was on Halloween 2012.

**N. Father's Counseling**

Andrew Santi, a licensed professional counselor with Merit Family Services, testified that Father was one of his clients in May 2013. Santi testified that Father did not seem to care to be in counseling and was not forthcoming in

his answers, which appeared to contradict themselves and were vague or philosophical.

Father said that he smokes e-cigarettes because it "looks cool and helps to promote [his] products" and that he drinks wine "every once in a while." He admitted that he had experimented with marijuana three times at age sixteen. Father told Santi that he had been arrested for pandering in 2008 and that he had been arrested for felony unauthorized use of a motor vehicle and for possession of cocaine.[19] Santi said that Father downplayed all of the charges and explained them in a way that took the blame off himself and that Father seemed to not be able to recall the name of the pandering charge or what it meant.

Father told Santi that he had spanked D.A. because D.A. had sneaked out of the house on Halloween night to go across the street to see a female friend whose parents were "into drugs" and other illegal activity and then had lied about having gone there. Father told Santi that he had accidentally bruised his son. Father was not willing to accept that the injuries were child abuse.[20] Father referred to it many times as having been unfortunate and said that it was a one-time incident, that he and his family had no history of violence, and that it did not

---

[19]The record includes two convictions dated June 25, 2010, for unlawful possession of a controlled substance (cocaine) and for unauthorized use of a motor vehicle for which Father was sentenced to six months in jail.

[20]Santi did not recall reading a March 28, 2013 note from the prior counselor at Merit in which Father admitted that the incident had crossed the line.

27

seem like that big of a deal. Father told Santi that CPS was conspiring against him, that the case was built on lies, and that CPS was trying to remove D.A. for no good reason.

Father's conversations did not give Santi any indication of the extent of the injuries on D.A. During the termination trial when Santi was shown the pictures of D.A.'s injuries, Santi had a shocked look on his face because "[t]hose pictures were not what I envisioned from what [Father] had described to me." Santi testified that Father had minimized D.A.'s injuries.

Santi testified that Father "seemed somewhat strangely detached regarding all of this about his case," and Santi did not feel that Father took the counseling or the CPS case very seriously. Santi testified that when people do not take the reason that they are in counseling seriously, it makes it difficult to make any progress through counseling. Santi did not believe that Father was willing to change what was going on in his life.

Santi saw Father only once after developing the treatment plan because Father had completed a total of twelve counseling sessions between his sessions with Santi and Father's previous counselor. Santi testified that Father had not made any progress toward the goals identified in his treatment plan.[21] When

---

[21]The goals for counseling were to improve and develop more effective parenting skills, to develop more assertive communication behaviors, to improve Father's emotional and conflict management, to establish more stability and more boundaries in the home, and to explore new ways of reducing and managing stress.

Santi informed Father that he had not successfully attained the goals that had been set out for him and that more sessions were needed, Father became very upset, very agitated, and indignant. Father was unsuccessfully discharged from counseling because the long-term and short-term goals were not met.[22]

## O. Father's Testimony

Father testified that he and Mother had married around age eighteen after meeting when they were eleven or twelve. Father testified that D.A. is his only son.[23]

Father testified that Mother mostly cared for D.A. when he was young because Father worked twelve hours a day, six days a week. Father testified that he has always provided financially for D.A. Father owns Wise Distribution and does direct marketing and sales of perfume, cologne, audio books, and electronic cigarettes. Father testified that it was 100% not accurate when Davis testified that Father had not provided any documentation for his income; Father testified that he had provided his tax information.

---

[22]The therapy notes state,

> This therapist still has significant concerns about [Father's] judgment, decision-making, emotional/conflict management, his potentially abusive and controlling relationship with his wife and son, and overall incredibly narcissistic perspective and attitude, but he appears unwilling and/or incapable of exploring the issues in his life and/or this unhealthy perspective at this time and further sessions will likely be fruitless.

[23]Father has a daughter with whom he no longer has contact; she is not involved in this appeal.

Father and Mother lease a house in Grand Prairie and have a room waiting for D.A., although Father noted that D.A.'s belongings are partially in his closet and partially in the attic because D.A. had not lived with them since they moved into this house. Father said that there is always food in their house, that they prepare healthy meals, and that he and Mother read to D.A. every night. Father testified that their home has structure and that it is calm, except for when they are joking and playing. Father testified that he had never hit Mother and that the police had never come to their home in response to a domestic disturbance call.

Father testified that D.A. "at the end of age five" initially went to stay with Paternal Grandmother for the summer while Mother and Father went to Las Vegas for Father's job. Father said that he "got in trouble with the law enforcement agency" and was not allowed to come back to Texas in a timely manner,[24] so D.A. remained with Paternal Grandmother for a year and attended kindergarten in Jacksboro.

Father and Mother returned to Texas when D.A. was six,[25] and he went to first grade in Arlington. Father said that this is when D.A. developed his love for sharks and also enjoyed playing with Legos and playing outside. Father said that

---

[24]Father had trouble admitting that he had pleaded guilty to the charge of possession of cocaine. But Father admitted to D.A.'s attorney ad litem that Father used to sell drugs.

[25]When Father picked up D.A. from Paternal Grandmother's, he believed that D.A. had a light version of autism.

30

D.A. attended second and third grade in Arlington and that he had won numerous awards.

Father said that Mother felt that she was spanked too often and too much and that nothing positive came from it, so Father said that they were trying not to do that. Father's intention when he used corporal punishment in the past was to redirect D.A. by inflicting some level of pain for a negative stimulus response. Father testified that he had previously spanked D.A. on four occasions: the first time was for opening the door to a census worker and giving him information, the second time was for not telling Father that a girl had fought him, the third time could not be recalled, and the fourth time was when Father spanked D.A. with the belt on Halloween.[26] Father's understanding was that if behavior warranted a spanking, "then it need[ed] to send a message" and that was the discipline that he had used on D.A. "on the one occasion."

Father testified that the plan on Halloween 2012 was to go trick-or-treating around the neighborhood. Father talked to Mother for a little while,[27] and when Father went to get D.A., he was not in the house. Father testified that he

---

[26]Father said that Madden had lied when she testified that Father had told her at the hospital that he had not used his hand during previous spankings because he did not think that he could use his hand. Father thought that he had said he had used a belt more than once. He testified that he had used a belt when D.A. opened the door to the census worker.

[27]Father testified that Mother's great-grandmother had passed away on October 29, 2012; that Mother had been more emotional than he had ever seen her; and that she had stayed that way for two weeks after the loss.

31

checked the living room, the backyard, and D.A.'s room. Father called out for D.A. and went looking for D.A. in the neighborhood for ten to fifteen minutes. Father said that he was very concerned and that his heart was racing. Father decided to go back to the house to tell Mother that they needed to look for D.A. in the other direction, and Father found D.A. sitting in the living room. Father yelled at D.A., questioning where he had been, and D.A. did not respond. Father said that D.A. had not been trick-or-treating, but he did not say where he had been. Father asked D.A. a few more times with different wording and went to get a belt[28] "to scare him into telling [] the truth." Father then brought D.A. into Father's bedroom "to further make him feel like, hey, that you might really, really get a spanking, you need to, you know, start talking to me so we can open up so we can talk." Father said that he spanked D.A. around seven times, "give or take one or two." Father admitted that he had told the CPS investigator that he had spanked D.A. for five minutes but clarified that the spanking was not continuous but was interspersed with his asking D.A. questions. Father did not see the belt hit D.A. in the face. Father testified that after he spanked D.A., he realized that he might have been too aggressive and that D.A. was not responding to him because he was afraid and freezing up. Father told D.A. to stand in the corner for three to five minutes. After Father put D.A. in the corner, Father apologized and talked to D.A. about the importance of telling the truth and not leaving the

_____

[28]Father said that the belt was a stylish belt, belonging to his wife, and was made of fake leather with a clasp.

32

house.  Afterwards, they played some games at home and did not go trick-or-treating.

Father said that he was trying to get D.A. to tell the truth,[29] and it got out of hand.  Father testified that he was "unconscious"[30] when he made the decision to use corporal punishment on October 31.  He said that after the event, he remembered the details about the belt and hitting D.A. seven times, but he did not know what was going on inside his head; he testified that his mind was not right.  Father testified that he had previously spanked D.A. on the butt.  When asked why he hit D.A. on the back and on the face on October 31, Father said, "I don't actually really know that answer myself:  I mean, I know that -- what -- I wasn't going to spank him.  I was trying to threaten him and I think I was just, like, really, like -- I was outside of my right mind truly in -- in that time period."  Father said that he knows what abuse feels like because his great-grandmother abused him and that he believed that the discipline had helped him,[31] but Father did not believe that a beating like D.A. had suffered was helpful to D.A.

---

[29]Father testified that D.A. had told him a lie on several locations, but Father agreed with Ms. Foster's testimony that D.A. would rather remain silent than tell a lie.

[30]Father said that when he described his behavior as being unconscious, he did not mean unconscious as in dead but rather that he was "not aware of [his] unconscious behaviors."

[31]Father testified that he was not spanked very often but that when he was, his great-grandmother retrieved a switch or a flyswatter and "whoop[ed]" him; sometimes it broke the skin and left marks and bruises.  Father said that his stepfather's mother had used a belt or her hands.

33

Father testified that when he saw the photographs of D.A.'s injuries in December 2012, he was "in denial a little bit." Father said that the photographs he had received in discovery were "pictures of pictures" and looked like they had been altered. Father did not believe that D.A.'s injuries "had looked like that"; he "didn't think that they could be that bad." But Father admitted that he could not say what D.A.'s back had looked like on Halloween after the beating because D.A. was wearing a costume and because Father did not put D.A. to bed or wake him the next morning. Father ultimately agreed that the pictures showed a beating rather than a spanking.

Father said that the photographs of D.A.'s injuries and the video of D.A.'s forensic interview[32] made him feel remorse and "[a] lot of emotions." He said that he had shared those emotions with every single person he had talked to since he had seen the photos.

Father testified that everything about D.A.'s injuries was serious: the fact that the belt had hit D.A. in the face, which was unintentional; the level of disregard for that to have happened; and Father's inexperience with spanking with a belt. Father admitted that he had caused the injuries on D.A. and that there was nothing else that could have caused D.A.'s injuries except Father's blows to D.A. with the belt.

---

[32]Father said that when the video with D.A. was played, he felt bad for D.A. because Father had put him in that situation and because he was probably confused about how to respond.

34

Father testified that he had confessed to the detective that he had given D.A. a spanking,[33] that it was excessive, and that he had also confessed to his first counselor, Santi, Davis, and the CASA volunteer.  Father said that they were twisting his words to say that he had not confessed in order to sway the jurors.  Father said that Davis and the CASA worker were purposely lying by saying that he and Mother did not take parenting classes.  Father testified that Davis had lied "over and over," that she had switched the times of their visitations, that she had yelled at him on multiple occasions, and that he had recorded her because he "felt like there was something funny going on since -- since day one."

Father testified that he had attended his counseling sessions,[34] that he had bought a $150 cognitive behavior therapy textbook, that he had bought a book entitled *How to Discipline Without Spanking or Yelling*, that he had read books and articles and had watched videos, that he had researched Asperger's, and that he had taken a parenting class.  Father said that he and Mother gave Davis the certificate from their parenting class on the first day of the termination trial.

---

[33]Father disagreed that he had always called the incident on Halloween 2012 a "spanking."

[34]Father testified that he had changed counselors because his first counselor was located too far away.  Father testified that he could not understand Santi's method and that Santi was late to all of the sessions.  Father testified that he did not know why Santi wanted Father to continue counseling because he had admitted to wrongdoing and understood "how heinous it was thoroughly."

35

Father said that he had attended every session of an eighteen-week batterer's intervention class.

Father testified that it was not true that the CASA volunteer had attended most of the visits; Father recalled that the CASA volunteer had attended only four or five visits. Father testified that D.A. had never been afraid in the visits and that the evidence shows that D.A. is not fearful of Father. Father said, "Everyone who has ever seen a visit knows that my visits go well. It's not -- they're not being -- they're intentionally being dishonest. They know that the visits are good. They're saying that on purpose." Father said that during the visits, D.A. enjoyed watching science videos. Father said that they play a lot of competitive games and joke around a lot. Father said that D.A. got too loud but that Father was never redirected for being too loud; "[t]hat was a bald-faced lie." Father said that there were purple pompoms in the room that he played with, but he had never thrown them in the trash. He said, "Could you imagine that? Me standing up and throwing somebody else's -- somebody else's toys in the trash? That would be absurd. But this whole thing is absurd." Father testified that he does not have a negative opinion about 4-H and said that if he had used a country accent, he was just joking around and being funny; Father could not recall what he had said about 4-H because it was not remarkable. He said that D.A.'s eyes never welled up with tears and that they joked around all the time. Father said that the testimony about this was "[c]omplete fabrication." Father later admitted that they were redirected about four times during the visits and that the person who

36

transported D.A. to the visits always agreed that they responded very well to redirection. With regard to the unauthorized visit to D.A.'s soccer game and fall festival, Father admitted that he had violated the trial court's order requiring supervised access to D.A.

Father testified that with regard to his service plan, the hard part was trying to create the work schedule and work in all the things they had to do with only one vehicle and making changes when the visits were shifted around. Father admitted that he was not working on all of the services at the same time.

Father testified that he could guarantee that the discipline that occurred on October 31, 2012, would never happen again because it was not a habit; it was one occasion. Father said that he had learned about different emotional triggers and "the different resources." Father said that he had previously believed that disciplining was a parent's right, but after studying cognitive behavior therapy, his "philosophy on parenting completely is different."

Father testified that he loves D.A. Father agreed that D.A. did not deserve the level of discipline that he received on October 31, 2012. Father testified that he deeply regrets everything that had occurred with D.A. Father testified that this has been on his mind every single day since it happened and said that he would do anything to get D.A. back; he would jump through "many hoops and fiery rings, whatever is asked" to get D.A. back. Father said that his mind cannot grasp the concept of his never seeing D.A. again.

## P. Mother

Mother testified that she met Father in middle school and had been married to him for ten years at the time of the termination trial. Mother testified that she was not a victim of domestic violence and that Father had never hit her or threatened to hit her. Mother testified that Father would walk out and go somewhere before he ever put his hands on her. Mother testified that she had not had a black eye since she was six years old. Mother later admitted that she had shown up at her family's home with a black eye in 2013 after she had gotten into a fight with a girl when she worked at Cabaret East.

Mother testified that she believes that D.A. has Asperger's. She said that D.A. got in trouble at school for taking too long in the bathroom because he had a vivid imagination and his mind wandered. Mother testified that D.A. would not say anything if he knew it was a lie and that it took him time to respond to questions in a timely manner due to his Asperger's. Mother testified that Father did not get frustrated with D.A.'s process of responding because Father was very aware of D.A.'s condition and how D.A.'s mind worked. Mother testified that Father had never disciplined D.A. for not answering a question quickly enough.

On the night in question, Mother said that Father did not alert her when he discovered that D.A. was not in the living room; she was grieving for the loss of her great-grandmother. Mother said that Madden had lied when she testified that Mother had told her that she had heard Father spank D.A.; Mother testified that

she did not hear Father spank D.A.  Mother testified that she did not play games with Father and D.A. after the beating on October 31.

Mother testified that on November 1, she went to pick up D.A. after school at the normal time and saw an ambulance heading to the school.  She testified that no one from the school had called her.  After she waited a while and D.A. did not come outside, she went inside the school.  Two police officers came toward her, told her to go into the office, and one of the police officers took her cell phone.

Mother admitted that she had told Madden that she had told D.A. to lie about the bruise on his face.  Mother told D.A. to lie and say that he fell and got the bruise on his face because she did not want it "being blown out of proportion."

Mother said that she had never seen D.A. with bruises like the ones he had received on October 31 and that D.A. did not have any bruising on his body in the days preceding October 31.  Mother testified that this was the first time that D.A. had been brought into CPS's care.[35]  Mother acknowledged that Father was arrested on the injury-to-a-child charge during the middle of one of the visits.

---

[35]The record revealed prior CPS involvement with the family that did not result in removal:  on January 5, 2012, CPS received a referral alleging physical neglect of D.A. by his parents because he was eight years old and had not grown in the past two years; no evidence was found to support the allegations of physical neglect.

39

Mother said that she and Father had asked D.A. at every visit how he was doing. Mother testified that they played during every single visit, that they were loud, and that D.A. was happy to see them.

Mother said that they were never told that they needed to provide additional pages from their lease, nor were they told that CPS needed proof of income other than Mother's handwritten document.

Mother felt like what Father had done to D.A. was "extreme," and they have since talked about it. Mother agreed that it was a "beating." Mother testified that she knows that Father would not deliberately take a belt and strike D.A. across the face with it. Mother agreed, however, that the injuries Father had inflicted on D.A.'s back posed a danger to D.A. and that the injuries were deliberate. But Mother testified that Father should not be facing charges for the injuries he had caused D.A.

Mother testified that she would not be with Father if she thought he was a danger and that Father had never displayed any kind of violence or any red flags. Mother later testified that what Father did on Halloween 2012 raised red flags but that Father did not represent an ongoing threat to D.A.

### Q. Mother's Counselor

Jessica Barrientes, a counselor with Merit Family Services, testified that she met with Mother. Mother explained that CPS became involved because D.A. had been disciplined by Father and had received an injury on his back and one on his face, but she did not feel that it was abusive. Mother said that the injuries

40

were an accident, and she never moved from taking the position that the injuries were not the result of child abuse. Mother said that it was a one-time incident.

### R. Maternal Grandmother

Maternal Grandmother testified that Mother told her that she did not go to the hospital to see D.A. on November 1, 2012, because she was scared.

Maternal Grandmother testified that Mother walked into her house in March 2013, and Maternal Grandmother did not recognize Mother because she had bruises all over, "from head to toe." Mother said that she had a fight at work, but Maternal Grandmother did not believe Mother. Maternal Grandmother testified that Mother spent the night with her in March and asked her to drop her off at Walmart the next day; Mother said that Father would pick her up at Walmart. Mother did not let Maternal Grandmother take her home. Maternal Grandmother testified that Mother had shown up at Maternal Grandmother's house five times.

### S. Paternal Grandfather[36]

Paternal Grandfather testified that Father had never lived with him when he was growing up but that he had disciplined Father "with a belt across the behind," that he did it once or twice at most, but that he did not check to see if he left bruises. Paternal Grandfather testified that Father had lived with his maternal grandmother and that she had also disciplined him with a belt.

---

[36]Paternal Grandfather is not married to Paternal Grandmother.

41

Paternal Grandfather testified that Father had told him that he was fearful on October 31 because D.A. had left the house to go trick-or-treating on his own without communicating to Father; Father drove up and down the street looking for him. Paternal Grandfather testified that when D.A. went across the street to a place that was suspected of bad activities instead of coming straight home, "that set emotions a little high." Paternal Grandfather testified that Father told him that in the moment, "it became maybe more aggressive than he would have liked" but that his heart was in the right place; he was not trying to damage or beat up D.A. Father never told Paternal Grandfather that it was possible that D.A. had never left the house on the evening of October 31.

Paternal Grandfather testified that he had seen the photos of D.A.'s injuries and agreed that the corporal discipline had gotten out of hand. Paternal Grandfather testified that he did not believe the injuries to D.A. constituted child abuse because Paternal Grandfather believes that child abuse is a continuance, not a one-time occurrence.[37] Paternal Grandfather testified that neither he nor Father understand the law on child abuse.

Paternal Grandfather testified that Father felt regret and repentance in the year following the beating. Paternal Grandfather testified that Father loves D.A. and that it would be a tragedy for Father not to see D.A. again.

---

[37]Paternal Grandfather testified that he had never seen D.A. with bruises on him that were of concern.

### T. Father and Mother's Housemate

Matthew testified that at the time of the termination trial, he had been living with Mother and Father for a year and a half. Matthew worked for Father and needed a place to live, so Father had taken Matthew "under his wing." Matthew said that Mother and Father's household is "always a beautiful atmosphere" and that there is never a negative vibe.

Matthew testified that Father is a good dad. Matthew had never witnessed any physical abuse of D.A., had never seen marks or bruises on D.A., had not witnessed Father be abusive to Mother, and had never seen Father lose his temper. Matthew admitted that he was out of state on the night of the beating.

### U. Recommendations

Davis testified that TDFPS's plan was for Father's parental rights to be terminated, making D.A. eligible for adoption. Ms. Foster said that D.A. has not been in her home very long, but she was willing to consider adopting him.

Baird recommended that the jury terminate Father's parental rights. Baird testified that termination of the parental rights is in D.A.'s best interest. Baird based his recommendation on the large change that he had seen in D.A. in the short period of time that he had been in Ms. Foster's home; Baird said, "When you give [D.A.] the time to be able to speak, he's blossomed."

Father testified that it was in D.A.'s best interest to live with Father and Mother.

43

Paternal Grandmother testified that D.A. loves Father and that she did not think that Father's parental rights should be terminated; she did not think that would be in D.A.'s best interest.

Matthew testified that even after seeing pictures of D.A.'s injuries, which he would not describe as a beating, he believed that returning D.A. to Mother and Father was in D.A.'s best interest.

## V. Father's Parental Rights Terminated

After hearing the above testimony and reviewing the exhibits that were admitted into evidence, the jury found by clear and convincing evidence that Father had knowingly placed or had knowingly allowed D.A. to remain in conditions or surroundings that had endangered D.A.'s emotional or physical well-being, that Father had engaged in conduct or had knowingly placed D.A. with persons who had engaged in conduct that had endangered D.A.'s emotional or physical well-being, and that termination of the parent-child relationship between Father and D.A. was in D.A.'s best interest. Based on the statutory grounds found by the jury, the trial court ordered the parent-child relationship terminated. Father thereafter perfected this appeal.

## III. STANDARDS OF REVIEW

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*,

44

685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough." *E.N.C.*, 384 S.W.3d at 810. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, TDFPS must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at

803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

## A. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). In this case, Father challenges the endangering-environment and endangering-conduct findings. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

46

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

### B. Factual Sufficiency

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated section 161.001(1)(D) or (E) and that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1)(D)–(E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. Sufficiency of Evidence to Support Endangering-Environment and Endangering-Conduct Findings[38]

In his first and second issues, Father argues that the evidence is legally and factually insufficient to support the section 161.001(1)(D) and (E) findings. Father contends that the incident that occurred on October 31, 2012, was the result of a single act by Father and does not meet the standard of a course of conduct required for termination of his parental rights.

### A. Law on Endangerment

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under section 161.001(1)(D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional

---

[38]We have engaged in a thorough review of the entire appellate record, which contains approximately 1,800 pages and two videos. Based on the Texas Supreme Court's recent decision in *In re A.B.*, No. 13-0749, 2014 WL 1998440, at *6–7 (Tex. May 16, 2014), when affirming a jury verdict, we are not required to detail all of the relevant evidence that we considered in reaching our decision to affirm.

well-being of the child.  *See id.* at 776–77; *Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act.  *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E).  It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury.  *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125.  The specific danger to the child's well-being may be inferred from parental misconduct standing alone.  *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.  *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).  A factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent.  *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.).  Even evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child can support a finding that a parent engaged in a course of conduct that endangered the child's well-being if the Department introduces evidence concerning the offenses and establishes that the offenses were part of a voluntary course of

49

conduct that endangered the child's well-being.  *E.N.C.*, 384 S.W.3d at 804–05; *In re A.J.M.*, 375 S.W.3d 599, 606 (Tex. App.—Fort Worth 2012, pet. denied).

In conducting an evidentiary sufficiency review of a factfinder's subsections 161.001(1)(D) and (E) findings, this court has previously considered, among other things, evidence that a child was exposed to domestic violence.  *See In re M.R.*, 243 S.W.3d 807, 818 (Tex. App.—Fort Worth 2007, no pet.).  Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review.  *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *J.T.G.*, 121 S.W.3d at 126.

## B.  Sufficient Evidence of Endangerment

As set forth above, Father admitted that he had caused the injuries to D.A.'s face and back and that there was nothing else that could have caused the injuries except Father's blows to D.A. with the belt.  Father ultimately agreed that the pictures show a beating rather than a spanking and that everything about D.A.'s injuries was serious.  Father's argument on appeal is that the single "spanking" on October 31, 2012, does not constitute a course of conduct.

Section 161.001(1) provides that the court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has "(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or] (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional

50

well-being of the child; . . . ." Tex. Fam. Code Ann. § 161.001(1)(D), (E). The "course of conduct" language that Father references is thus not found in the statutory grounds for termination listed in section 161.001(1)(D) or (E). *See id.*

Instead, the "course of conduct" language appears to come from *Boyd*, which dealt with whether a parent's imprisonment could constitute evidence of endangering conduct under former Texas Family Code section 15.02(1)(E). 727 S.W.2d at 534.[39] To the extent that case law requires a "course of conduct," the factfinder was free to believe that October 31, 2012, was not the only time that D.A. had been beaten. *Cf. Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.— Houston [1st Dist.] 2010, pet. denied) (stating that evidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future). The medical records revealed that the bruises on D.A.'s back were in various stages of healing, indicating the possibility of previous abuse; Father admitted that he had "spanked" D.A. on four occasions, three of which had occurred prior to the incident in question; Madden testified that Father had told her that he had never spanked D.A. with his hand; D.A. was afraid of Father; and D.A.'s forensic interview and Paternal

---

[39]The "course of conduct" language appears to have originated in *H.W.J. v. State Department of Public Welfare*, 543 S.W.2d 9, 10–11 (Tex. Civ. App.— Texarkana 1976, no writ). *H.W.J.*, like *Boyd*, looked at terminating a parent's parental rights when the parent's persistent criminality, which did not directly endanger the child, led to protracted incarceration. 543 S.W.2d at 10–11.

Grandmother's testimony indicated that D.A. had been hit previously with a clothes hanger.

Father, moreover, did not seek medical treatment for D.A.'s injuries following the Halloween 2012 beating. Additionally, Father violated the trial court's orders by having unsupervised contact with D.A. on two occasions.

Father's conduct specifically directed against D.A. was not the only endangering conduct that the jury had before it. Father failed to complete the tasks on his service plan, including an unsuccessful discharge from individual counseling and failure to complete a CPS-approved parenting class. The record also includes Father's admission that he had previously used and sold drugs and contains the judgments for Father's criminal convictions for unlawful possession of a controlled substance (cocaine) and for unauthorized use of a motor vehicle for which Father was sentenced to six months in jail.

Although there is conflicting evidence regarding whether Father was abusive to Mother, the conflicting evidence is not so significant that a reasonable trier of fact could not have reconciled the evidence in favor of its finding and formed a firm belief or conviction that Father had knowingly placed or had knowingly allowed D.A. to remain in conditions or surroundings that had endangered D.A.'s emotional or physical well-being or had engaged in conduct or had knowingly placed D.A. with persons who had engaged in conduct that had endangered D.A.'s emotional or physical well-being.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold (1) that there is some evidence of endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that Father had knowingly placed or had knowingly allowed D.A. to remain in conditions or surroundings that had endangered D.A.'s emotional or physical well-being and (2) that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Father had engaged in conduct or had knowingly placed D.A. with persons who had engaged in conduct that had endangered his physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *J.T.G.*, 121 S.W.3d at 131 (holding evidence legally sufficient to support endangerment findings because father had a history of domestic violence, drug abuse, and criminal conduct).

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Father had knowingly placed or had knowingly allowed D.A. to remain in conditions or surroundings that had endangered D.A.'s emotional or physical well-being and that Father had engaged in conduct or had knowingly placed D.A. with persons who had engaged in conduct that had endangered his physical or emotional well-being. *See In re*

53

*N.S.G.*, 235 S.W.3d 358, 362–63, 368–69 (Tex. App.—Texarkana 2007, no pet.) (holding evidence factually sufficient to support endangerment finding because father had used drugs, had physically abused his wife, and had engaged in criminal conduct); *In re J.C.*, 151 S.W.3d 284, 288–89 (Tex App.—Texarkana 2004, no pet.) (holding evidence factually sufficient under section (E) because, among other facts, father was indicted for injury to a child after beating child with a belt and leaving bruises on child from his head to his toes).

We therefore hold that the evidence is legally and factually sufficient to support the trial court's endangering-environment and endangering-conduct findings as to Father. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E). We overrule Father's first and second issues.

## V. BEST-INTEREST FINDING

In his third issue, Father argues that the evidence is factually insufficient to support the section 161.001(2) finding that termination of the parent-child relationship between Father and D.A. is in D.A.'s best interest.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *C.H.*, 89 S.W.3d at 28; *see*

54

*E.C.R.*, 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include the following:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *E.N.C.*, 384 S.W.3d at 807; *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors").

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the

presence of scant evidence relevant to each factor will not support such a finding. *Id.*

With regard to D.A.'s desires, although he did not testify at trial, the record contains evidence that he was fearful of Father and that the bulk of D.A.'s counseling sessions focused on helping him cope with his anxiety related to his fear that Father would spank him at the visits if D.A. took too long to answer Father's questions. Father testified that D.A. was never fearful of him during the supervised visits. But the record revealed that after the unsupervised visits that Paternal Grandmother allowed D.A. to have with Mother and Father in October 2013, D.A.'s behavior deteriorated, and he began having a lot of behavioral problems at school. The CASA volunteer reported that D.A. had adjusted well to Ms. Foster's home, was well behaved and compliant, had improved his social skills, and was helping other children in the home. Additionally, D.A. told Ms. Foster that he liked being in her home because she would not hit him Although the record contains evidence that D.A. loves Father, the jury was entitled to find that this factor weighed in favor of termination of Father's parental rights to D.A.

With regard to the emotional and physical needs of D.A. now and in the future, the record reveals that, in addition to basic needs,[40] D.A. needs a home in which his care providers are willing to learn about Asperger's and how to work with a child who has been physically abused. Dr. Bates testified that he would

---

[40]One reference was made in the record that D.A. needs allergy medication, but other times in the record, no medications were listed.

have a lot of fear about a household that rejects the idea that D.A. has Asperger's and that he would be concerned about a home in which the care providers think that there is nothing wrong with the discipline that D.A. received that caused his injuries. Dr. Bates stated that discipline for D.A. will have to be "a little bit out of the norm, thinking outside the box" because corporal punishment is not going to be effective and would probably "go the opposite way." Dr. Bates said that D.A. needs a home in which his care providers understand that when D.A. does not respond to a question, he is locked up and possibly nervous, but he is not being defiant. Dr. Bates summarized that D.A. needs a home with a lot of understanding and that is calm, that provides structure, and that lets D.A. know what is to be expected and what is going to happen. The record contains conflicting testimony about the extent to which Father accepted D.A.'s Asperger's diagnosis, while the record reveals that Ms. Foster was familiar with handling autistic children and provided a calm environment that allowed D.A. to thrive. The jury was entitled to find that this factor weighed in favor of termination of Father's parental rights to D.A.

With regard to the emotional and physical danger to D.A. now and in the future, the record reveals that D.A. is vulnerable due to his autism. Moreover, as discussed above, after numerous counseling sessions, D.A. remained afraid that Father would hit him if he did not respond quickly enough to Father's questions and that D.A. felt safe in Ms. Foster's home because he knew that she would not hit him. The record also revealed that Father did not complete a CPS-approved

57

parenting class. Father, however, testified that he could guarantee that the discipline that occurred on October 31, 2012, would never happen again because it was not a habit; that he had learned about different emotional triggers and the resources to help him; and that after studying cognitive behavior therapy, his "philosophy on parenting completely is different." The jury was entitled to find that this factor weighed in favor of termination of Father's parental rights to D.A.

With regard to parenting abilities, the evidence detailed above reveals that although Father expressed that he loves D.A. and attended most of the visits, Father had not eliminated the physical and emotional dangers to D.A. Father had not completed a CPS-approved parenting class. The record contains conflicting testimony on whether Father took full responsibility for causing D.A.'s injuries due to his references to the Halloween incident as a "spanking" and to his initial disbelief that the pictures depicted the actual extent of the injuries that Father had caused D.A. The record also reveals that it was the school and the police who sought medical treatment for D.A.'s injuries, not Father. The record further contains conflicting testimony on whether Father had fully accepted D.A.'s diagnosis of Asperger's and knew how to handle it. The jury was entitled to find that this factor weighed in favor of termination of Father's parental rights to D.A.

With regard to the programs available to assist Father to promote the best interest of D.A., the record reveals that Father was not forthcoming during his counseling sessions and had not worked all of the services available to him to

58

promote the best interest of D.A. The jury was entitled to find that this factor weighed strongly in favor of termination of Father's parental rights to D.A.

With regard to the plans for the child, Father planned for D.A. to live with him and Mother. Father said that they had a room ready for D.A., but Father had never provided CPS with proof of a lease, showing that D.A. could live at the house, or income documentation, showing that Father could provide financially for D.A. TDFPS planned for D.A. to be placed for adoption,[41] and Ms. Foster testified that she was willing to consider adopting D.A. The jury was entitled to find that this factor weighed in favor of termination of Father's parental rights to D.A.

With regard to the stability of Father's home, the record reveals that Father and Mother had leased a home in Grand Prairie but had not provided CPS with a copy of the lease showing that D.A. could live there. Father testified that their home has structure and that it is calm, except for when they are joking and playing. Because Mother and Father had frequently placed D.A. with Paternal Grandmother for long periods of time and because Father faced the potential of jail time for his pending criminal charge for injury to a child, the stability of the home was in question. With regard to the stability of the proposed placement, the record reveals that Ms. Foster's home provides D.A. with an organized, quiet, and calm environment that suits D.A. well. The CASA volunteer observed D.A. in

___

[41]We note that based on the outcome of the trial, D.A. is not eligible for adoption because Mother's parental rights were not terminated.

Ms. Foster's home and reported that he appeared to be well adjusted, calm, happy, very clean, and well dressed. Ms. Foster testified that D.A. was welcome to stay in her home for as long as he needed to stay. The jury was entitled to find that this factor weighed in favor of termination of Father's parental rights to D.A.

With regard to the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, the analysis set forth above—which details Father's abuse of D.A., as well as D.A.'s fear of Father; Father's failure to meet D.A.'s physical and emotional needs; Father's failure to address the physical and emotional dangers to D.A.; Father's convictions and admissions that he had previously used and sold drugs; and Father's failure to take advantage of the services that were offered to ensure that he could provide a calm, stable environment for D.A.—reveals that the existing parent-child relationship between Father and D.A. is not a proper relationship. The jury was entitled to find that this factor weighed in favor of termination of Father's parental rights to D.A.

With regard to any excuse for Father's acts or omissions, the record revealed that Father initially blamed D.A.'s bruises on a health condition that caused him to bruise easily. Father testified that he was unconscious when he made the decision to use corporal punishment on D.A. on Halloween 2012 and that his mind was not right. Father initially believed that the pictures of D.A.'s injuries had been altered because he "didn't think that they could be that bad."

60

Father also said that he had not been told any of the rules about spanking and that D.A.'s injuries were the result of his inexperience in using a belt. According to Father's counselor Santi, Father downplayed all of his prior criminal charges and explained them in a way that took the blame off himself. Father said that it was hard to work his services and run his business because they had only one vehicle. Father claimed that everyone from CPS, his counselors, and the CASA volunteer had conspired against him and had lied. The jury was entitled to find that this factor weighed in favor of termination of Father's parental rights to D.A.

After reviewing the entire record and weighing the evidence as it relates to the *Holley* factors, we hold that the evidence is factually sufficient to support the jury's finding that termination of Father's parental rights to D.A. is in D.A.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan*, 325 S.W.3d at 733 (holding evidence factually sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best-interest factors weighed in favor of termination); *M.R.*, 243 S.W.3d at 820–22 (holding evidence factually sufficient to support best-interest finding because, among other things, children flourished in foster care, mother did not work service plan, and parents exposed children to domestic violence). We overrule Father's third issue.

## VI. CONCLUSION

Having overruled Father's three issues, we affirm the trial court's judgment terminating Father's parental rights to D.A.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: WALKER, MCCOY, and MEIER, JJ.

DELIVERED: July 31, 2014